UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SANDRA KRAUSE, Individually
and as Personal Representative of the
Estate of Matthew Thomas Krause,

    Plaintiff,                                    Civil Action No. 12-cv-10265
                                                       HON. BERNARD A. FRIEDMAN

vs.

BRIAN D. JONES, et al.,

    Defendants.
_____/

**OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

**I.    Introduction and Facts**

Sandra Krause ("plaintiff") commenced this action on behalf of the estate of her son, Matthew Krause (the "decedent"), against the Township of Redford (the "Township") and three of the Township's police officers, Officer Brian D. Jones, Lieutenant Eric Gillman and Sergeant Duane Gregg (collectively "defendants") pursuant to 42 U.S.C. § 1983. Plaintiff maintains that the officers used excessive deadly force in attempting to extract the decedent from his bedroom after an armed standoff. Plaintiff also alleges a state claim for gross negligence against the individual officers.[1] Before the Court is defendants' motion for summary judgment [docket

---

[1] Plaintiff consents to the dismissal of so much of the complaint asserting that defendants violated the decedent's right to substantive due process under the Fourteenth Amendment. Pltf. Br. at 9. Additionally, plaintiff concedes that Michigan law does not recognize a cause of action for monetary damages resulting from violations of the Michigan State Constitution. Id. at (i). The Court will dismiss so much of the complaint as against the Redford Police Department

entry 14]. Plaintiff filed a response [docket entry 17] and defendants filed a reply [docket entry 18]. The Court will rule on defendants' motion without oral argument pursuant to E.D. Mich. LR 7.1(f)(2).

On August 16, 2006, local authorities apprehended the decedent at his residence located at 8906 Seminole Street in Redford Township, Michigan. Def. Br. Exh. 6 at 1. After conducting a lawful search of the premises, officers recovered sizeable quantities of cocaine, marijuana and ecstasy. Id. They also seized a cache of weapons including a handgun and an assault rifle. Id. The Wayne County Prosecutor's Office charged defendant with felony possession of cocaine in an amount over 50 grams. Def. Br. Exh. 2 at 1. When the decedent failed to appear for his arraignment, the state district court issued a bench warrant for his arrest in March 2007. Def. Br. Exh. 6 at 1.

More than a year later, the United States Marshals Service opened a fugitive investigation into the decedent's whereabouts at the request of the Livonia Police Department. Id. On the morning of December 12, 2008, members of United States Marshals Fugitive Apprehension Team located the decedent at his home and attempted to arrest him. Def. Br. Exh. 2 at 1; Exh. 6 at 2. "Wearing clearly identifiable U.S. Marshal and Police insignia," the marshals approached the residence and knocked on the front door. Def. Br. Exh. 6 at 2. The decedent answered and immediately slammed the door closed, fleeing into the interior of the house. Def. Br. Exh. 2 at 1; Exh. 6 at 2. The marshals then "forced the front door" open, entered the house and commenced a room-to-room sweep of the entire residence. Def. Br. Exh. 6 at 2. When they eventually reached the decedent's bedroom, the door was closed. Def. Br. Exh. 2 at 1; Exh. 6 at

---

because plaintiff stipulates that the department is not a proper party defendant. Id.

2. One of the marshal's opened it while another entered the room "identifying himself as a U.S. Marshal." Id. Once inside, the marshal glanced to his right and saw the decedent pointing a handgun at him. Id. Dodging from the bedroom, the marshal yelled "GUN" and took cover in a nearby restroom. Id. The remaining marshals converged around the bedroom, identified themselves and advised the decent that they had a warrant for his arrest. Id. But the decedent refused to surrender. Instead, he threatened to "kill any law enforcement officer who [attempted] to enter the bedroom" and confirmed that he was, in fact, carrying a handgun along several other firearms. Id. Even as the marshals attempted to negotiate his surrender, the decedent continued to threaten them, shouting "let's do this. I'm ready to die, are you?" Def. Br. Exh. 6 at 2. Faced with a "barricaded gunman situation," the marshals vacated the house and relinquished "command of the scene" to the Redford Police Department's S.W.A.T. Team (the "S.W.A.T. Team"). Id. at 3.

    Sergeant Duane Gregg of the Redford Police Department arrived at the decedent's home after the department's dispatcher summoned him to serve as a negotiator. Def. Br. Exh 3 at 11. He attested that he spoke with the decedent over the course of approximately eight hours and encouraged him to surrender. Id. at 48. Throughout their conversation, the decedent made several references to "suicide by cop" and that "he was not coming out alive." Def. Br. Exh. 2 at 2. Sergeant Gregg recalled that communications with the decedent began to severely deteriorate as he became more convinced of his demise. Negotiations came to a standstill when the decedent "started to say good-bye" to his relatives. Def. Br. Exh 3 at 19. Thereafter, Sergeant Gregg exited the premises and stationed himself in the garage for the duration of the operation. Id. at 20.

With the termination of the negotiations, the S.W.A.T. Team began surveiling the inside of the residence. They used several video devices to pinpoint the decedent's exact location within the bedroom. Def. Exh. 5 at 34-35. The footage revealed that the decedent had secreted himself in a bedroom closet and that he had fallen asleep. Id. at 36, 55. At this time, John Buck, the Chief of the Redford Police Department, authorized the S.W.A.T. Team to enter the bedroom and extract the decedent. Id. at 54-55. The team's commanding officer, Lieutenant Eric Gillman, assigned one officer to deploy a flash-bang device in the bedroom while another team member, Officer Brian Jones, would serve as the lead officer upon entry. Id. at 55-56. Pursuant to standard operating procedures, the team members set their weapons to fire automatically because they believed that the decedent was armed with an assault rifle. Id. at 59. At the outset of the tactical phase of the operation, Lieutenant Gilman recounted that the decedent exchanged gunfire with Officer Jones the moment the officer entered the bedroom and that the rest of the team members soon followed. Id. at 62-63. Once inside, he saw Officer Jones sitting on the floor, inspecting himself for bullet wounds. The decedent laid motionless in the closet with several bullet wounds to the chest and abdomen. Id. at 64-65, 68. Another team member then removed the handgun from the decedent's grasp and the officers secured the scene. Id. at 66.

Officer Jones offered a similar account of the operation. He averred that the S.W.A.T. Team used a pole camera to not only ascertain the decedent's position, but to determine how many firearms he had closeted with him. Def. Exh. 4 at 54. Although a blanket obscured the decedent's hands, the officers "knew there was a possibility of a [semi-automatic] long gun being there." Id. at 56, 64, 78. Once the operation began, Officer Jones averred that he was the first team member to enter the bedroom after the flash-bang device had discharged. Id. at 68, 81.

Setting himself in a crouching position, Officer Jones quickly moved to the center of the bedroom when he saw the muzzle flash of a handgun coming from the direction of the closet. Id. at 82. As he fell backwards to avoid the gunfire, Officer Jones responded by firing his own weapon in the direction of the closet, where he could see that the decedent had been fatally wounded. Id. at 85. In all, the decedent sustained 19 bullet wounds throughout his upper torso, abdomen and arms. Pltf. Br. Exh. 6.

After the operation concluded, the Michigan State Police conducted a post-incident forensic investigation of the scene. Their ensuing report corroborated the officers' testimony. Investigators recovered a .38 caliber revolver with an "empty casing in the cylinder." Def. Exh. 2 at 2. A single round was "found lodged in the wall exit to the bedroom doorway" and "appeared to have entered from an upward angle." Id. Investigators also discovered a bullet hole "in the closet door which shows that the round had been fired from inside/near the closet, where [the decedent] had been found to be lying seated at an upward angle towards the [bedroom] doorway." Id. Plaintiff never contested any of these findings.

In their motion for summary judgment, defendants argue that plaintiff's excessive use of force claim should be dismissed because the conduct of the individual officers is protected by the doctrine of qualified immunity. Defendants also maintain that the Township cannot be subject to liability because the individual officers did not violate the decedent's constitutional rights. In any event, defendants assert that plaintiff "failed to identify any policy or custom of the Township that caused the alleged constitutional violation." Defendants further allege that plaintiff's cause of action for gross negligence is barred by the doctrine of governmental immunity pursuant to Mich. Comp. Laws § 691.1407(2).

Plaintiff counters that the individual officers used excessive deadly force when they attempted to extricate the decedent from his bedroom. Plaintiff asserts that the officers acted unreasonably because, immediately before entering the bedroom, they set their weapons to fire automatically when they already knew that the decedent was asleep. Plaintiff maintains that such conduct is not protected by the doctrine of qualified immunity and constitutes gross negligence. Additionally, plaintiff contends that the Township failed to adequately train its officers to deploy flash-bang devices and properly use the semi-automatic setting on their weapons during a "barricaded gunman" situation.

## II.     Standard of Review

Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. In considering a motion for summary judgment, the Court will construe all facts in a light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986). There are no genuine issues of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Id. If the movant carries its burden of showing an absence of evidence to support a claim, then the nonmovant must demonstrate by affidavits, depositions, answers to interrogatories and admissions that a genuine issue of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 324-325 (1986).

## III.    Analysis

The individual officers are entitled to qualified immunity because they did not use excessive deadly force in attempting to extricate the decedent. Courts make two inquiries when evaluating whether a section 1983 claim is barred by the doctrine of qualified immunity: (1)

taken in the light most favorable to plaintiff, do the facts show that the officers' conduct violated a federal right, and (2) was the right clearly established to the extent that a reasonable person in the officers' position would know that the conduct complained of was unlawful. King v. Taylor, 694 F.3d 650, 661-662 (6th Cir. 2012).

With respect to the federal right at issue here, the Fourth Amendment prohibits officers from using excessive force to effectuate an arrest. Graham v. Connor, 490 U.S. 386, 394-395 (1989). Courts apply an objective-reasonableness standard to "determine whether a constitutional violation based on excessive force has occurred." McColman v. St. Clair County, No. 10-2567, 2012 U.S. App. LEXIS 7499, at *12 (6th Cir. Apr. 12, 2012) *quoting* Binay v. Bettendorf, 601 F.3d 640, 647 (6th Cir. 2010). This framework must account for "the facts and circumstances of each case [when] viewed from the perspective of a reasonable officer on the scene and not with 20/20 hindsight." Id. Consequently, the reasonableness of the deadly force used "to subdue a suspect depends upon whether 'the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others.'" King, 694 F.3d at 662 *quoting* Tennessee v. Garner, 471 U.S. 1, 11 (1985).

After reviewing the record in this case, two things become clear: the decedent was armed and he exhibited a willingness to use deadly force. Before the S.W.A.T. Team even arrived on the scene the decedent had already pointed a loaded handgun at the marshals and threatened to kill them if they tried to arrest him. The individual officers also possessed intelligence that the decedent was heavily armed, perhaps with a semi-automatic assault rifle. And most importantly, it is undisputed that the decedent shot at Officer Jones when he entered the bedroom, leaving him no choice but to respond with the deadly force necessary to eliminate such a mortal threat.

On the contrary, plaintiff argues that the officers' tactics were unwarranted, especially in light of the fact that the decedent had already fallen asleep.  The Court disagrees.  Officer Jones and Lieutenant Gillman entered the decedent's bedroom with the knowledge that he possessed a handgun and faced the prospect that he was armed with a cache of deadly weapons.  Amidst such treacherous conditions, they could not have been expected to assure their own safety, and that of the decedent's, by simply tip-toeing into the bedroom, tapping him on the shoulder and serenely rousing him from his sleep.

In view of the foregoing, the Court finds that Officer Jones and Lieutenant Gillman conducted the extraction in an objectively reasonable manner because they had probable cause to believe that the decedent posed a threat of serious physical harm to themselves, their colleagues and to others. Garner, 471 U.S. at 11.  Insofar as Sergeant Gregg is concerned, plaintiff failed to establish that he had any role in the planning or execution of the extraction and the record demonstrates that he was stationed outside the police perimeter throughout the entire tactical phase of the operation.  Thus, the individual officers are shielded from liability by the doctrine of qualified immunity and this determination "resolves the claim against the [Township] as well." Jones v. Reynolds, 438 F.3d 685, 698 (6th Cir. 2006).

To the extent plaintiff contends that the individual officers were grossly negligent, her argument is also unavailing.  Gross negligence is not available as an independent cause of action when a plaintiff claims excessive use of force under section 1983. See Bletz v. Gribble, 641 F.3d 743, 756 (6th Cir. 2011); Korner v. City of Sterling Heights, No. 09-12564, 2011 U.S. Dist. LEXIS 80721, at *17-18 (E.D. Mich. July 25, 2011).  As a result, the gross negligence claim is dismissed.

Accordingly,

IT IS ORDERED that defendants' motion for summary judgment is granted.

Dated: August 15, 2013          s/Bernard A. Friedman
Detroit, Michigan               BERNARD A. FRIEDMAN
                                SENIOR UNITED STATES DISTRICT JUDGE

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on August 15, 2013.

                                s/Deborah J. Goltz for Carol Mullins
                                CAROL MULLINS
                                Case Manager